IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

BELINDA S. LEWIS,

      Plaintiff,

v.                                        CASE NO. 1:09-cv-00139-MP-AK

MICHAEL J ASTRUE,

      Defendant.

_____/

**O R D E R**

This action is brought pursuant to 42 U.S.C. § 405(g) of the Social Security Act

(Act) for review of a final determination of the Commissioner of Social Security (Commissioner)

denying Plaintiff's applications for disability insurance benefits (DIB) and supplemental security

income benefits (SSI) filed under Titles II and XVI of the Act.

Upon review of the record, the Court concludes that the findings of fact and

determinations of the Commissioner are supported by substantial evidence and the decision of

the Commissioner is affirmed.

A.      **PROCEDURAL HISTORY**

Plaintiff filed an application for DIB and SSI on December 20, 2005, alleging a disability

onset date of August 11, 2004, because of knee, back, and shoulder aches; arthritis; and severe

headaches. Plaintiff petitioned for a hearing before an administrative law judge (ALJ), who

conducted a hearing on December 17, 2007, and entered an unfavorable decision on February 26,

2008. The Appeals Council denied Plaintiff's request for review, thus making the decision of the

ALJ the final decision of the Commissioner. This action followed.

B.        **FINDINGS OF THE ALJ`**

The ALJ found that Plaintiff had the severe impairments of morbid obesity, mild disc disease of the cervical and lumbar spine, and depressive disorder, but that these impairments did not meet the listing requirements.  While the ALJ found Plaintiff to have medically determinable impairments that could reasonably cause some degree of pain and limitations, he did not find the intensity, persistence, and limiting effects reported by Plaintiff to be entirely credible.  Specifically, the ALJ referred to Plaintiff's assertions and demeanor at the hearing, evidence of her activities and lifestyle, and the reports of physicians and psychologists.  Two state agency physicians determined that Plaintiff "could stand, walk and sit six hours in an eight-hour workday and lift 20 pounds."  (R. 22).  Dr. Chodosh, a consultative physician, concluded that Plaintiff "could sit normally and stand and walk, but not extensively."  (R. 22).  The ALJ found that Dr. Chodosh's opinion was consistent with light exertion.  The ALJ did not accord any weight to the opinion of Dr. Hoehn, a chiropractor.  Noting that Plaintiff's obesity would limit her to light exertion, the ALJ adopted the opinions of the state agency physicians.

The ALJ determined that Plaintiff has "moderate deficiencies in concentration, persistence and pace as testing did place her in the borderline range of intellectual functioning." (R. 22).  The two state agency psychologists found that Plaintiff did not have a severe mental impairment secondary to mild restrictions of daily living, mild limitations in social functioning, mild deficiencies in concentration, persistence and pace, and no episodes of decompensation. Dr. Poetter, a consultative psychologist, determined that Plaintiff "met Listings 12.04 and 12.07 and opined that [she] had marked restrictions of activities of daily living, moderate limitations in social functioning, marked deficiencies in concentration, persistence and pace and repeated

episodes of decompensation." (R. 22). The ALJ accorded little weight to Dr. Poetter's opinion, noting that Dr. Poetter's evaluation did not support such limitations. Dr. Nazario concluded that Plaintiff could concentrate as well as understand and follow directions. The ALJ noted that the record indicates Plaintiff's failure to seek mental health treatment since the onset date, and she has not been psychiatrically hospitalized. Further, the ALJ found a lack of evidence concerning repeated episodes of decompensation. Thus, the ALJ limited Plaintiff to "performing simple and repetitive tasks on a sustained basis." (R. 22).

The ALJ also found that Plaintiff was not capable of performing her past relevant work as a receptionist and general office clerk. The ALJ determined, however, that Plaintiff was capable of obtaining and maintaining employment other than her past relevant work. The ALJ noted that transferability of job skills was not material to the disability determination because the Medical-Vocational Guidelines did not support a finding that Plaintiff is disabled. The ALJ relied on the testimony of a vocational expert, who stated that, based on Plaintiff's age, education, work experience, residual functional capacity, and body habitus, Plaintiff could perform work such as a ticket seller. The vocational expert also testified that there are significant numbers of jobs for ticket sellers in the national economy. Thus, based on the Medical-Vocational Guidelines and vocational expert testimony, the ALJ found that Plaintiff was not disabled during the time period at issue.

## C.    ISSUES PRESENTED

Plaintiff argues that the ALJ erroneously concluded that Dr. Chodosh's opinion was consistent with "light exertion," and he failed to provide reasons for not according weight to Dr. Chodosh's determination that Plaintiff could lift no more than fifteen pounds. Plaintiff contends

that the ALJ erred by not crediting Dr. Poetter's opinion, indicating that Plaintiff had a significant reading limitation. Plaintiff further argues that the hypothetical question posed to the vocational expert by the ALJ failed to include the ALJ's finding that Plaintiff was limited to non production-oriented work, Plaintiff's difficulties with reading, and Plaintiff's borderline intellectual functioning. Finally, Plaintiff argues that the ALJ erred in not addressing Dr. Johnson's opinion or including it with the record before this Court.

The government responds that the ALJ properly considered the medical opinion of Dr. Chodosh, including properly finding that Dr. Chodosh's opinion was consistent with the ability to perform light exertion. The government argues that the ALJ correctly discounted Dr. Poetter's opinion, including properly finding that Dr. Poetter's opinion was inconsistent with the record. Further, the government contends that the ALJ posed a complete hypothetical to the vocational expert, and the ALJ comprehensively described Plaintiff's limitations. Because the ALJ did not find that Plaintiff's impairments of reading deficiency and borderline intellectual functioning were severe, the government argues that the ALJ's failure to include these impairments in his hypothetical was harmless error. Finally, the government responds that the administrative record is complete.

The issue thus presented is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence in the record and decided by proper legal standards.

### D. STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court. The

Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied. Graham v. Apfel, 129 F.3d 1420, 1422 (11th Cir. 1997). Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam). It is more than a scintilla, but less than a preponderance. Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Wolfe v. Chater, 86 F.3d 1072, 1076 (11th Cir. 1996). It must determine only if substantial evidence supports the findings of the Commissioner. See Bridges v. Bowen, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam). Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the Commissioner's findings, the court cannot overturn them. Barron v. Sullivan, 924 F.2d 227, 230 (11th Cir. 1991). Unlike the deferential review accorded to the Commissioner's findings of fact, his conclusions of law are not presumed valid. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). The Commissioner's failure to apply correct legal standards or to provide the reviewing court with an adequate basis for it to determine whether proper legal principles have been observed requires reversal. Id. (citations omitted).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less

than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or

mental impairment must be so severe that claimant is not only unable to do his previous work,

"but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.

Plaintiff bears the burden of establishing a severe impairment that keeps him from performing

his past work.  If Plaintiff establishes that his impairment keeps him from his past work, the

burden shifts to the Commissioner at step five to show the existence of other jobs in the national

economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792

F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If

the Commissioner carries this burden, Plaintiff must prove that he cannot perform the work

suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is

within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision

with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir.

1990).

E.    SUMMARY OF CLAIMANT'S RELEVANT MEDICAL HISTORY

Because the ALJ's decision is dated February 26, 2008, the relevant medical records concern Plaintiff's condition prior to that time and after the onset date of August 11, 2004.

In September 2004, Plaintiff sought treatment from the Alachua County Health Department for back pain and a refill of her medications.  (R. 152).  On October 13, 2004, Plaintiff was diagnosed with hypertension, obesity, osteoarthritis, and depression.  (R. 159).  Progress notes, dated January 31, 2005, reveal that Plaintiff was experiencing "pain [and] bilateral radiation into her shoulders and down both upper arms."  (R. 151).  An MRI was recommended, but Plaintiff did not attend the appointment due to an illness.  (R. 147, 151).  On April 6, 2005, Plaintiff again sought refills of her medication, and she was diagnosed with obesity, neck pain, hypertension, and depression.  (R. 147).  In May 2005, Plaintiff reported that her neck pain had not improved, and she received a trial of Ultram.  (R. 145).  Based on a suggestion from her chiropractor, Plaintiff requested a referral for pain management on June 10, 2005.  (R. 144).  At that time, she reported numbness and paresthesias in her fingers.  (R. 144).  Plaintiff had limited range of motion in her neck, and "pain to palpation of cervical/thoracic spine."  (R. 144).  On June 15, 2005, radiographs revealed mild mid thoracic degenerative disc disease.  (R. 142).  Between September 2004 and June 2005, Dr. Hoehn, a chiropractor, treated Plaintiff for pain.  (R. 162-183).

Dr. Murphy began treating Plaintiff on July 26, 2005, for chronic pain.  (R. 194-196).  Plaintiff was experiencing pain in her back, hips, left arm, shoulders, neck, and knees; numbness in her hands; and chronic headaches with blurred vision, photophobia, and phonophobia.  (R. 194).  Plaintiff believed that her symptoms were related to a motor vehicle accident in 2000.  (R.

194).  Dr. Murphy's report indicated that Plaintiff "denie[d] problems with self-care or

mobility."  (R. 195).  Physical examination revealed that Plaintiff was morbidly obese, but not in

distress.  (R. 195).  Plaintiff had "mild diffuse poorly localized tenderness to palpation over the

cervical and shoulder girdle areas," and full range of motion in her neck and shoulders.  (R. 195).

Neurological examination revealed full strength in Plaintiff's upper extremities.  (R. 196).  Dr.

Murphy diagnosed Plaintiff with chronic neck and shoulder pain status post automobile accident

in 2000, mild degenerative disc disease at C3-4 and C6-7, disc bulge and osteophytes at C5-6,

chiari-I malformation, chronic headaches, morbid obesity, and hand paresthesias.  (R. 196).  On

August 25, 2005, Plaintiff reported fatigue from taking her medication and a general lack of

change in her symptoms.  (R. 192).  A lumbar spine MRI revealed "lower lumbar degenerative

changes most notable at L4-5 where there is disc desiccation, disc bulging and prominent

bilateral facet arthrosis."  (R. 191).  On September 26, 2005, Dr. Murphy reported normal results

from electrodiagnostic studies of Plaintiff's right upper extremity.  (R. 186).  The EDX

impression was carpal tunnel syndrome "that is primarily demyelinating without active axonal

degeneration."  (R. 186).  Plaintiff was referred for "lumbar facet ESI vs dorsal medial branch

blockades," and to an "ophthalmologist for eval[uation] and treat[ment] for cataracts as well as

blurred vision, which may be part of the culprit of her headaches."  (R. 187).  Plaintiff was

provided with wrist splints.  (R. 187).  Dr. Murphy reported that Plaintiff failed to obtain a

laboratory workup and she left without her prescription.  (R. 187).

 Dr. Chodosh, a consultative physician, examined Plaintiff on March 16, 2006, for "'pain

in the knees and back, arthritis, severe headaches and depression.'"  (R. 197-203).  Dr. Chodosh

reported that Plaintiff was "independent in activities of daily living," but she was limited to

walking a distance of one-half of a block and standing for fifteen minutes. (R. 197). Plaintiff's hand function, hearing, and speech were normal; her "vision correct[ed] adequately"; and she could drive short distances. (R. 197). Physical examination revealed that Plaintiff was morbidly obese, but did "not otherwise appear unhealthy." (R. 198). Dr. Chodosh noted that Plaintiff was "fully oriented, ha[d] normal speech pattern, appropriate content, and normal affect." (R. 198). He further reported that Plaintiff had slightly decreased range of motion in her neck due to pain, trace ankle edema and "mild popping without crepitation . . . on movement of both knees," and limited range of motion in her knees caused by obesity. (R. 198-199). Neurological tests revealed that Plaintiff's motor function was "grossly normal" in all four extremities. (R. 199). Dr. Chodosh further reported that Plaintiff's straight leg testing was negative. (R. 199). Plaintiff's gait was "essentially normal, with a slight waddling quality from obesity," and she was "[n]ot able to walk effectively on heels or toes." (R.199). Plaintiff was diagnosed with morbid obesity, "[c]hronic low back pain secondary to mechanical factors from obesity, and degenerative processes," chronic headaches, and chronic knee pain without overt signs of arthritis. (R. 200). Dr. Chodosh opined that Plaintiff was "able to see, hear, and speak normally," and she could "walk and stand, but not extensively." (R. 200). Further, Dr. Chodosh determined that Plaintiff could sit normally, comprehend and follow directions, and handle light objects. (R. 200). He concluded that Plaintiff could "lift [fifteen] pounds, but [could not] carry any significant weight"; and she was "unable to squat, kneel, or crawl." (R. 200). Dr. Chodosh noted that "assessment activity could not be completed because claimant complained of pain, or requested that it be stopped." (R. 200).

In a Physical Residual Functional Capacity Assessment completed on March 23, 2006,

Dr. Bancks reported that Plaintiff had the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday.  (R. 204-211).  Dr. Bancks further reported that Plaintiff had postural limitations of occasional climbing ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; and never climbing ladders, ropes or scaffolds.  (R. 206).

Dr. Nazario, a licensed psychologist, performed a consultative evaluation of Plaintiff on March 27, 2006.  (R. 212-214).  He reported that Plaintiff "walked without difficulty and her posture and gait appear[ed] within normal limits."  (R. 212).  Plaintiff reported constant headaches; back, knee, shoulder, and foot aches; and arthritis since 2001.  (R. 212).  She stated that she was in pain "all the time."  (R. 212).  She further reported "no history of mental illness, although she stated that she takes medication for depression."  (R. 212).  Plaintiff stated that she just wanted to sleep and not be bothered.  (R. 212).  She was able to shop for groceries and attend to her own personal hygiene.  (R. 213).  Plaintiff reported feeling anxious and unhappy. (R. 213).  She attempted suicide two years before the evaluation, but she was not hospitalized and did not report suicidal ideation at the time of Dr. Nazario's evaluation.  (R. 213).  Dr. Nazario reported that Plaintiff's mood was "somewhat depressed," but she was oriented and her memory was intact.  (R. 213).  He stated that Plaintiff was able to concentrate, her pace "appeared adequate," and she "was not persistent in her approach."  (R. 213).  Dr. Nazario diagnosed Plaintiff with depressive disorder, and he recommended that she seek a psychiatric consultation for a medication regime.  (R. 214).  He further noted that Plaintiff "appear[ed] able to concentrate, and able to understand and follow directions," but she was "somewhat terse in

her interactions." (R. 214).

In a Psychiatric Review Technique form completed on April 20, 2006, Dr. Shepherd reported that Plaintiff had the following functional limitations: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (R. 216-221). On September 12, 2006, Dr. Zelenka reported the same findings as Dr. Shepard in a separate Psychiatric Review Technique form. (R. 223-228). In a Physical Residual Functional Capacity Assessment dated September 14, 2006, Dr. Rees noted that Plaintiff had the following exertional limitations: occasionally lifting twenty pounds, frequently lifting ten pounds, standing or walking for about six hours in an eight-hour workday, and sitting for about six hours in an eight-hour workday. (R. 229-236). Dr. Rees further reported that Plaintiff had postural limitations of occasional climbing, balancing, stooping, kneeling, crouching, and crawling. (R. 231).

On March 15, 2007, Dr. Poetter, a licensed and clinical psychologist, performed a psychological evaluation of Plaintiff at her request. (R. 237-240). He noted that Plaintiff had never been psychiatrically hospitalized, and her "only counseling included one visit to Shands Teaching Hospital-Vista." (R. 238). Plaintiff reported that she related well with others, but she no longer had an interest in socializing with friends. (R. 238). Dr. Poetter noted that Plaintiff was markedly obese, but she "walks independently without signs of balance or coordination difficulty." (R. 238). He stated that Plaintiff winced frequently and often closed her eyes while speaking. (R. 238). The mental status examination revealed that Plaintiff had moderate deficits in immediate memory skills, mild deficits in immediate or short-term auditory memory, and

moderate deficits in judgment and common sense reasoning skills. (R. 239). Dr. Poetter

reported that Plaintiff's quick and accurate performance on mental control exercises was

"inconsistent with any severe concentration deficits." (R. 239). Plaintiff stated that she had

difficulty sleeping and her energy level was low. (R. 239). Test results revealed that Plaintiff

had a verbal IQ of 72, "in the low end of the Borderline range of intelligence"; mild deficits in

spelling and math; and moderate deficits in word reading skills. (R. 239). The test results

further revealed that Plaintiff had a "severe level of depressive symptoms." (R. 239). Dr.

Poetter diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic

features; dysthymic disorder; pain disorder associated with psychological factors and a general

medical condition; and borderline intellectual functioning. (R. 240).

On April 6, 2007, Dr. Poetter completed a questionnaire regarding his evaluation of

Plaintiff. (R. 242-274). He noted that he observed Plaintiff one time for a duration of three

hours. (R. 242). Dr. Poetter identified Plaintiff's symptoms as poor memory, appetite

disturbance with weight change, mood disturbance, emotional liability, adhedonia or pervasive

loss of interests, psychomotor retardation, suicidal ideation or attempts, social withdrawal or

isolation, decreased energy, somatization unexplained by organic disturbance, and pathological

passivity. (R. 242). He stated that Plaintiff was not a malingerer, and her impairments were

reasonably consistent with her symptoms. (R. 243). Dr. Poetter reported that Plaintiff's ability

to remember work-like procedures, understand and remember very short and simple instructions,

carry out very short and simple instructions, sustain an ordinary routine without special

supervision, make simple work-related decisions, ask simple questions or request assistance, be

aware of normal hazards and take appropriate precautions, set realistic goals or make plans

independently of others, and maintain socially appropriate behavior was good. (R. 245-246). Plaintiff's ability to maintain regular attendance and be punctual, complete a normal work schedule without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number of breaks was poor. (R. 245). Dr. Poetter found that Plaintiff had marked restrictions of activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of decompensation in work settings. (R. 247). He reported that Plaintiff met Listing 12.04 and 12.07. (R. 247).

## F.    SUMMARY OF THE ADMINISTRATIVE HEARING

Plaintiff was 49 years old at the time of the hearing. (R. 364). She has a high school education. (R. 364). Plaintiff reported that she has been approximately 100 pounds overweight since she stopped working in 2001. (R. 364-365). She has past relevant work as an accounts clerk, which included tasks of filing, data entry relating to bills, communicating with vendors, and assisting with payroll. (R. 365-366). Plaintiff explained that she would organize the boxes of files at the end of the fiscal year, and this task involved lifting boxes that weighed approximately forty to fifty pounds. (R. 366). During the rest of the year, Plaintiff normally lifted files weighing twenty to thirty pounds. (R. 366). She would spend about three hours a day filing, and about four hours a day sitting. (R. 366-367). Plaintiff also had to bend down and stoop. (R. 366). She reported that she was fired from this job because her performance declined "all of a sudden" and she was "filing in the wrong place." (R. 369).

Prior to working as an accounts clerk, Plaintiff maintained employment as a lead worker at an Alachua County jail. (R. 367). Plaintiff supervised record clerks, and she counted the

inmate files twice a day to "make sure that they were there." (R. 367). She also booked the inmates in and out and performed payroll functions. (R. 368). Her daily tasks did not involve lifting, but she spent about four to five hours a day sitting. (R. 368). While performing sitting tasks, Plaintiff would frequently have to get up to obtain paperwork. (R. 368). At the end of the year, Plaintiff would archive the files in a similar manner as her accounts clerk position. (R. 368-369). Plaintiff held this position from 1989 to 1998. (R. 369).

Since 2001, Plaintiff tried to perform work as a housekeeper. (R. 370). She reported that she was in "[a] lot of pain, [and] just real slow." (R. 370). Plaintiff testified that her employer said she could not perform the job. (R. 370). This position lasted for approximately one month. (R. 370).

Plaintiff testified that headaches and back tension in the middle and lower back prevented her from working. (R. 371). She reported that she was diagnosed with arthritis in the back. (R. 371). Plaintiff estimated that she gets uncomfortable within two hours of sitting, and she has to "lift [her] leg and put it on something to . . . try to make [her] feel better." (R 371). Plaintiff believes that lifting her leg relieves the pressure on her back. (R. 371-372). She reported that she can stand for "about an hour . . . maybe less." (R. 372). She can stand to do dishes for about ten to fifteen minutes before she has to take a break for about twenty minutes. (R. 372). Plaintiff can walk for about five to ten minutes before she experiences pain in her back and hips. (R. 372). She stated that the bottoms of her feet are "starting to get in bad shape." (R. 372). When shopping, Plaintiff leans on the basket while walking through the store. (R. 373). Although it is painful, Plaintiff can bend down. (R. 373). She can stoop or squat if she has something to support her. (R. 373).

Plaintiff also related that she is unable to turn her wrist to open things, and this problem started in 2005. (R. 373-374). Plaintiff has not had surgery for carpal tunnel in her wrists. (R. 374-375). She said that prior to March 2007 she might have been able to lift ten pounds, but she could not hold that weight because her arm and hand started hurting. (R. 375). She does not have difficulty picking up change, and she can write for about five minutes. (R. 376).

Plaintiff gets approximately three to four headaches per week, and she believes that they are from the tension in her shoulder and back. (R. 376). She reported that she has headaches for an entire day, and she has to lie down to relieve the pain. (R. 377). Plaintiff described the headaches as being similar to "a strain in the eyes," and she related that the headaches cause her to have difficulty concentrating and focusing. (R. 377). The pain in her neck and upper back is "always there," and the medications only help to put her to sleep. (R. 377-378). When taking the medications, Plaintiff suffers from constipation and she becomes tired. (R. 378).

Plaintiff reported that she experiences difficulty sleeping, but she has not been tested for sleep apnea. (R. 378-379). She also suffers from depression, only leaving home "every now and then." (R. 379). Plaintiff stated that she does not feel mentally capable of performing her former activities, including teaching classes. (R. 380). Plaintiff receives help from her brother and sister-in-law, and they do Plaintiff's housework and laundry. (R. 381). Plaintiff reported that she does the stretches that the doctor gave her to do, but they do not relieve her pain. (R. 381-382). The health department is no longer treating Plaintiff because she does not have Medicaid. (R. 382). Plaintiff has trouble breathing, possibly due to her weight, and arthritis in her knees. (R. 383).

The ALJ then heard testimony from Robert C. Bradley, a vocational expert. Mr. Bradley

reported that, based on his vocational expertise and review of the vocational materials, he had

"formulated an opinion in writing of [Plaintiff's] past [relevant] work." (R. 385).

The ALJ posed the following hypothetical to Mr. Bradley:

[A]n individual of the claimant's age, education, past work experience and body habits
and this first RFC is based partially on B10F as the physical RFC was done by Dr.
Reeves. Assume the individual can only lift/carry 10 pounds frequently, 20 pounds
occasionally; stand six, sit six; should avoid frequent ascending and descending stairs;
should avoid pushing and pulling motions with her lower extremities; can perform
pushing and pulling motions with her upper extremities; can perform activities requiring
bilateral manual dexterity; should avoid hazards in the workplace; should be restricted to
a relatively clean work environment. As far as postural activities, no climbing;
occasional balance, and stoop and crouch, kneeling and crawling. Non-exertional B9F
suggest mild restrictions of activities of daily living; mild difficulties maintaining social
functioning; mild difficulties maintaining concentration, persistence and pace. Do you
have an opinion whether such an individual with that given profile could perform any of
the claimant's past work?

(R. 386-387). Mr. Bradley testified that the hypothetical individual could perform both of

Plaintiff's past jobs. (R. 387). The ALJ then asked Mr. Bradley to assume further that the

hypothetical individual "would require work which is low stress; simple, unskilled, one, two, or

three-step instructions; and assume further the individual has psychologically-based symptoms

which affects her ability to concentrate on complex or detailed tasks but she would remain

capable of understanding, remembering, and carrying out simple job instructions." (R. 387).

Mr. Bradley stated that these additional limitations would eliminate the hypothetical individual's

ability to perform Plaintiff's past relevant work. (R. 387). However, Mr. Bradley explained that

this hypothetical individual could work as a ticket seller, a fast food worker, or a cashier II. (R.

387-388). He further testified that these occupations exist in significant numbers in both the

state of Florida and the national economy. (R. 387-388). Next, the ALJ asked Mr. Bradley to

assume that the same hypothetical individual required a "sit and stand option." (R. 388). Mr.

Bradley testified that the hypothetical individual could still perform work as a ticket seller, but this limitation would eliminate the fast food worker and cashier II positions. (R. 388). Mr. Bradley further opined that the hypothetical individual only has transferrable skills related to "sedentary work, operation of office equipment, basically clerical skills." (R. 388).

Mr. Bradley further testified that there are "several" jobs which required skills that the Plaintiff has acquired in past work but do not exceed the Specific Vocational Preparation (SVP) level of three. (R. 388-389). He explained that these positions include a food checker and a telephone operator. (R. 389). Mr. Bradley testified that these occupations exist in significant numbers in both the state of Florida and the national economy. (R. 389).

The ALJ then posed a fourth hypothetical to Mr. Bradley: "sedentary with moderate difficulties in maintaining concentration, persistence and pace; mild difficulties in maintaining social functioning, mild restrictions of activities in daily living, do you have an opinion whether such an individual with that given profile could perform these two occupations?" (R. 389-390). Mr. Bradley explained that the additional limitations would eliminate the jobs of food checker and telephone operator. (R. 390). Plaintiff's attorney then asked Mr. Bradley to further assume that Plaintiff "would miss at least three days of work a month." (R. 390). Mr. Bradley opined that this limitation would prohibit Plaintiff from maintaining any jobs. (R. 390).

## G.    DISCUSSION

### 1. Dr. Poetter and Dr. Chodosh

Dr. Poetter opined that Plaintiff "had marked restrictions of activities of daily living, moderate limitations in social functioning, marked deficiencies in concentration, persistence and pace and repeated episodes of decompensation." (R. 22). Dr. Poetter also found that Plaintiff

had a significant reading limitation. Plaintiff contends that the ALJ did not adequately consider this opinion, and she contends that the ALJ must resolve inconsistencies in the evidence and explain his basis for not fully crediting this physician's opinion.

Likewise with Dr. Chodosh, Plaintiff argues that the ALJ failed to articulate his reasons for not crediting Dr. Chodosh's opinion that limited Plaintiff to lifting a maximum of fifteen pounds. Plaintiff also argues that the ALJ erroneously determined that Dr. Chodosh's opinion was consistent with "light exertion."

The opinion of a doctor examining a claimant one time need not be afforded great weight under the treating physician's rule. See Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986) (noting that rule giving great weight to physician's opinion does not apply where physician has only examined patient one time). Even if his or her opinion were to be accorded greater weight, the ALJ may discount in whole or in part even a treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991), (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)). An ALJ need only state with particularity the weight he assigns different medical opinions and explain his reasons for doing so. MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Caulder v. Bowen, 791 F.2d 872, 880 (11th Cir. 1986); Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992).

As the Commissioner explains, the ALJ was not required to give either opinion great weight, but also he clearly articulated his reasons for according little weight to their opinions. With regard to Dr. Poetter, the ALJ rejected Dr. Poetter's finding that Plaintiff had marked restrictions of daily living, moderate limitations in social functioning, and marked deficiencies in

concentration, persistence, and pace because it was not otherwise supported by the record,

including Dr. Poetter's own evaluation of Plaintiff. In contrast to Dr. Poetter, Dr. Nazario, also a

one time examiner, reported that Plaintiff "was able to concentrate, understand and follow

directions." (R. 22). Further, the two state agency psychologists opined that Plaintiff had only

mild limitations in activities of daily living, social functioning, and concentration, persistence,

and pace. The ALJ also noted that Plaintiff had not "been under any mental health treatment

since her alleged onset date," and there was "no indication that she is taking any medications for

depression." (R. 22). Finally, the ALJ noted that Plaintiff is able to prepare simple meals, drive,

and get along with family members.

  Dr. Poetter's additional finding that Plaintiff had repeated episodes of decompensation is

also inconsistent with the record. The Social Security regulations define "episodes of

decompensation" as:

> [E]xacerbations or temporary increases in symptoms or signs accompanied by a loss of
> adaptive functioning, as manifested by difficulties in performing activities of daily living,
> maintaining social relationships, or maintaining concentration, persistence, or pace.
> Episodes of decompensation may be demonstrated by an exacerbation in symptoms or
> signs that would ordinarily require increased treatment or a less stressful situation (or a
> combination of the two). Episodes of decompensation may be inferred from medical
> records showing significant alteration in medication; or documentation of the need for a
> more structured psychological support system (e.g., hospitalizations, placement in a
> halfway house, or a highly structured and directing household); or other relevant
> information in the record about the existence, severity, and duration of the episode.
>
> The term repeated episodes of decompensation, each of extended duration in
> these listings means three episodes within 1 year, or an average of once every 4
> months, each lasting for at least 2 weeks. If you have experienced more frequent
> episodes of shorter duration or less frequent episodes of longer duration, we must
> use judgment to determine if the duration and functional effects of the episodes
> are of equal severity and may be used to substitute for the listed finding in a
> determination of equivalence.

As the ALJ noted, the two state agency psychologists found no evidence of episodes of

decompensation.  The ALJ also noted that Plaintiff had never been psychiatrically hospitalized.

Thus, the ALJ fully explained his reasoning with regard to according little weight to the opinion

of Dr. Poetter.

With regard to Dr. Chodosh, Plaintiff creates a conflict between Dr. Chodosh's opinion

and the ALJ's decision where no conflict exists.  Dr. Chodosh opined that Plaintiff was limited

to lifting a maximum of fifteen pounds, and she "could sit normally and stand and walk, but not

extensively."  (R. 22).  The ALJ determined that Dr. Chodosh's opinion was "consistent with

light exertion."  (R. 22).  As defined by 20 C.F.R. §§ 404.1567(b) and 416.967(b), light work

involves lifting no more than twenty pounds at a time with frequent lifting or carrying objects

weighing up to ten pounds.  Social Security Ruling ("SSR") 83-10 states in pertinent part that

"the full range of light work requires standing or walking, off and on, for a total of

approximately 6 hours of an 8-hour workday.  Sitting may occur intermittently during the

remaining time."  Sedentary work is defined as "lifting no more than [ten] pounds at a time and

occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. §§

404.1567(a) and 416.967(a).  As the Government properly notes,

> Dr. Chodosh's opinion regarding Plaintiff's abilities does not correspond exactly with the
> criteria for light work stated in the regulations.  However, the ALJ did not state that Dr.
> Chodosh opined that Plaintiff could perform light work.  The ALJ stated that Dr.
> Chodosh's opinion was "consistent with light exertion" (Tr. 22).  While the ability to lift
> 15 pounds is not the full requirement for light work, it is consistent with an ability to
> perform more than sedentary work.

(Def. Br. at 5-6).  Accordingly, contrary to Plaintiff's arguments, the ALJ resolved

inconsistencies in the evidence and explained his basis for not fully crediting these physicians'

opinions.

2. The Vocational Expert

At the fifth step of the evaluation process, the ALJ must determine whether a Claimant, based on her residual functional capacity, age, education and work experience, can adjust to other work in the national economy. 20 C.F.R. § 404.1520(a)(4). The ALJ may make this determination by reliance upon the Medical Vocational Guidelines or by utilizing the services of a vocational expert. Phillips v. Barnhart, 357 F.3d 1232, 1239 (11th Cir. 2004).

When the ALJ uses a vocational expert, he elicits responses from the expert by posing hypothetical questions to him or her. Phillips, 357 F.3d at 1240. In order for the expert's testimony to constitute substantial evidence to support the ALJ's findings with regard to this point, the ALJ must pose a hypothetical which includes all of a Claimant's impairments. Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999). However, the ALJ is only required to pose those limitations he finds severe in the hypothetical to the expert. Pendley v. Heckler, 767 F.2d 1561, 1563 (11th Cir. 1985).

Plaintiff argues that the ALJ erred in not including the limitations of borderline intellectual functioning and a reading deficiency in his hypothetical to the vocational expert. However, as the ALJ found, the record reflects that Plaintiff's reading difficulties and borderline intellectual functioning were not severe impairments. Plaintiff did not allege such impairments during the application process, nor did she seek treatment for these impairments. Absence of treatment indicates that a mental impairment is not severe. Williams v. Sullivan, 960 F.2d 86, 89 (8th Cir. 1992). Also, a Claimant's failure to allege a mental impairment during the application process undermines the credibility of a mental impairment. Craig v. Apfel, 212 F.3d 433, 436

(8thCir. 2000). Further, Plaintiff has semi-skilled past relevant work where she was required to read files, assist with payroll, perform data entry operations, and organize records. See Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000) (noting that an ALJ can properly consider that a Claimant successfully held a job for many years with "the cognitive abilities [s]he currently possesses"). Accordingly, to the extent that Plaintiff argues that the ALJ was required to include the limitations of a reading deficiency and borderline intellectual functioning in his hypothetical, the Plaintiff's argument fails because these limitations were not severe.

Plaintiff also argues that the ALJ's hypothetical was incomplete because it did not include the ALJ's finding that she is limited to non-production work. Contrary to Plaintiff's argument, the ALJ included this restriction in his hypothetical by asking the vocational expert to assume that the hypothetical individual was limited to "low stress; simple, unskilled, one, two, or three-step instructions." (R. 387). Low stress work is often treated synonymously with non-production type work. See Boyce v. Astrue, 2008 WL 2620742 (N.D. Fla.) (ALJ found Plaintiff limited to "low stress (non-production oriented), simple, unskilled, with one, two or three step instructions"); Scott v. Astrue, 2010 WL 916395 (N.D. Fla) (ALJ found Plaintiff capable of performing "low-stress non- production-oriented, simple, unskilled work requiring one-, two-, or three-step instructions.") ; Norris v. Astrue, 2008 WL 4911794 (E.D.N.C.) ("low-stress work environment; thus, a nonproduction work environment.") The ALJ in Norris described production type work as "an assembly line that requires high-speed production of a product or associating a component with a product on an assembly line type of environment." Id., at 5. The jobs identified by the vocational expert in the present case were not production type, assembly line jobs, so obviously the expert understood the parameters set by the hypothetical. Thus, it

was unnecessary for the ALJ to add the words "non-production" to his hypothetical for it to

encompass Plaintiff's limitations, as established by the record.

Further, Plaintiff's argument that the hypothetical was deficient because the ALJ did not

define the term "low-stress" for the vocational expert has been rejected by this Court before.  See

Mace v. Astrue, 2008 WL 4058050 (N.D. Fla.).  The Court in Mace found that it was

unnecessary to define low stress in the hypothetical when it included the terms "simple,

unskilled, repetitive and routine." A hypothetical is sufficient if it includes limitations supported

by the record and the vocational expert describes jobs which fit within those limitations.  Mace,

at 7.  Other courts have found the term low stress to mean "one-and two-step jobs,"  Bradley v.

Barnhart, 175 Fed. Appx. 87 (7th Cir. 2006), or "unskilled."  Gallina v. Astrue, 2010 WL

743921 (D.N.J.).  Since the hypothetical included all these terms commonly associated with "low

stress" in the context of social security cases, it was unnecessary for the ALJ to define his use of

the term for the expert.

Thus, there is no merit to this argument.

3. The Administrative Record

An ALJ has a clear duty to fully and fairly develop the administrative record.  Brown v.

Shalala, 44 F.3d 931, 934 (11th Cir. 1995).  In carrying out this duty, an ALJ must "scrupulously

and conscientiously probe into, inquire of, and explore for all relevant facts." Smith v.

Schweiker, 677 F.2d 826 (11th Cir. 1982).  In all such cases, there must be a showing of

prejudice before remand is warranted for further development.  Brown, 44 F.3d at 935; Kelley v.

Heckler, 761 F.2d 1538, 1540 (11th Cir. 1985).  Prejudice has been found when the record has

"evidentiary gaps which result in unfairness or 'clear prejudice.'" <u>Brown</u>, 44 F.3d at 935, *quoting* <u>Ware v. Schweiker</u>, 651 F.2d 408 (5th Cir. Unit A July 1981), cert. denied 455 U.S. 912. An ALJ is not required to order medical evidence to have a complete record unless the record establishes that it is necessary to enable the ALJ to render his decision. <u>Holladay v. Bowen</u>, 848 F.2d 1206 (11th Cir. 1988) (concerning the ordering of a consultative examination; <u>Kelly</u>, 761 F.2d at 1540 (concerning additional medical information submitted by the claimant).

In the instant case, there is no indication in the medical evidence that there are any evidentiary gaps that may result in unfairness or clear prejudice to Plaintiff. Even though Plaintiff speculates in her brief that a June 14, 2006 letter from Dr. Johnson could have established that Plaintiff had the severe impairment of sleep apnea, the ALJ was not required to request such an opinion unless he found the record inadequate to make a final determination. The record reviewed by the ALJ included Dr. Johnson's treatment notes, and a disability report in which Plaintiff reported having sleep apnea. Furthermore, Plaintiff's attorney asked about Plaintiff's sleeping difficulties at the hearing before the ALJ on December 17, 2007. In response to questioning from her attorney, Plaintiff stated that she had never been tested for sleep apnea. Because the evidence of record was adequate to make a decision, the ALJ did not need to address the letter from Dr. Johnson in his determination. Therefore, the ALJ fully and fairly developed the record based on the claims and evidence presented by Plaintiff.

Accordingly, it is

**ORDERED AND ADJUDGED:**

That the decision of the Commissioner denying benefits be AFFIRMED.

**DONE AND ORDERED** this _9th_ day of July, 2010

_s/Maurice M. Paul_

Maurice M. Paul, Senior District Judge